J-S02023-23
J-S02024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: P.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1188 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  42 Adoptions 2020,
43 Adoptions 2020, 44 Adoptions 2020,
45 Adoptions 2020, CP-21-DP-0000078-2019,
CP-21-DP-0000262-2015, CP-21-DP-0000263-2015,
CP-21-DP-0000264-2015

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1189 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  043-adopt-2020

J-S02023-23
J-S02024-23

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1190 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 044-adopt-2020

| | | |
|---|---|---|
| IN RE: ADOPT. OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1191 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 045-adopt-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: P.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1192 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000262-2015

- 2 -

J-S02023-23
J-S02024-23

| | | |
|---|---|---|
| IN THE INTEREST OF: T.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1193 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000263-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1194 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000264-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1195 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000078-2019

- 3 -

J-S02023-23
J-S02024-23

| IN RE: ADOPTION OF: P.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1226 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  42 Adoptions 2020,
43 Adoptions 2020, 44 Adoptions 2020,
45 Adoptions 2020, CP-21-DP-0000078-2019,
CP-21-DP-0000262-2015, CP-21-DP-0000263-2015,
CP-21-DP-0000264-2015

| IN RE: ADOPTION OF: T.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1227 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  043-adopt-2020

- 4 -

J-S02023-23
J-S02024-23

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1228 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  044-Adoptions-2020

| | | |
|---|---|---|
| IN RE: ADOPT. OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1229 MDA 2022 |

Appeal From the Decree Entered August 3, 2022
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  045-adopt-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1238 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000078-2019

- 5 -

| | | |
|---|---|---|
| IN THE INTEREST OF: P.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1240 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000262-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: T.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1242 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000263-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: R.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1244 MDA 2022 |

Appeal From the Order Entered August 4, 2022
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000264-2015

BEFORE:  PANELLA, P.J., OLSON, J., and DUBOW, J.

MEMORANDUM BY OLSON, J.:                    **FILED: MARCH 13, 2023**

- 6 -

H.A.S. ("Mother") and J.A.S. ("Father") (collectively, "Parents") appeal from the August 3, 2022 decrees, in the Court of Common Pleas of Cumberland County, involuntarily terminating their parental rights to their daughters, P.S. (born in December 2012), T.S. (born in August 2014), and R.S. (born in November 2015), and their son, J.S. (born in June 2017) (collectively, "Children"). Parents also appeal from the August 4, 2022 orders, changing Children's permanency goals from reunification to adoption.

In addition, Mother's court-appointed counsel, R.H. Hawn, Jr., Esquire, and Father's court-appointed counsel, Sheri D. Coover, Esquire, have filed petitions to withdraw and accompanying briefs, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After careful review, we grant counsels' petitions to withdraw, affirm the termination decrees, and dismiss the appeals from the goal change orders as moot.

We begin with an overview of the relevant facts and procedural history. Cumberland County Children and Youth Services ("CYS") has been involved with the family for numerous years, beginning in December 2015.[1] N.T., 7/20/2022, at CYS Exhibits 1-4. Initially, in February 2016, Parents' daughters, P.S., T.S., and R.S., were adjudicated dependent. In May 2018, after Parents' substantial compliance with their permanency plans, the

_____

[1] The court orders/reports of Children's dependency dockets were admitted by the orphans' court as CYS Exhibits 1-4.

juvenile court terminated supervision and reunited the three children with Parents.

However, in May 2019, CYS received a referral from Silver Spring Township Police Department regarding dangerous environmental conditions in Parents' home. N.T., 7/20/2022, at CYS Exhibits 1-4; Shelter Care Order, 5/20/2019. According to the dependency petition, Parents home was in deplorable condition, including, (1) trash and piles of dirty laundry about shoulder height; (2) a stench emanating from the home and water dripping from the bottom of the trailer; and (3) subflooring exposed in part of the trailer. N.T., 7/20/2022, at CYS Exhibit 8; Dependency Petition, 5/22/2019. CYS made efforts to engage the family by providing in-home services but reported that Father was volatile and uncooperative, and Mother, due to post-traumatic stress disorder, was allegedly missing for significant periods of time on various occasions. N.T., 7/20/2022, at CYS Exhibits 1-4; Shelter Care Order, 5/20/2019. After a shelter care hearing, on May 20, 2019, the juvenile court awarded legal and physical custody of the Children to CYS and placed Children with their paternal grandparents. *Id.*

The court adjudicated Children dependent on August 23, 2019, and Children remained with paternal grandparents.[2, 3] A family service plan was implemented that required parents to (1) continue to improve the condition of the home, until it is safe and appropriate, and/or obtain and maintain housing that is appropriate for reunification; (2) cooperate with CYS; (3) complete a FAST evaluation provided by Alternative Behavior Consultants ("ABC"), and follow through with all recommendations made; (4) maintain regular contact with Children; (5) attend dental, medical, and educational appointments for Children; and (6) secure reliable transportation. N.T., 7/20/2022, at CYS Exhibit 13; Family Service Plan.

In January 2020, it was revealed that Parents lost their home, and on or around September 17, 2019, Parents began staying at the home of a maternal cousin in Enola, Pennsylvania.[4] N.T., 7/20/2022, at CYS Exhibits 1-4; Permanency Order, 1/8/2020. By permanency review order dated

---

[2] At the shelter care hearing, Parents' waived their right to have the adjudicatory hearing within ten days pursuant to Pa.R.J.C.P. 1404.

[3] Since February 2016, except for one motion hearing in May 2016 and the shelter care hearing in May 2019, the Honorable Edward E. Guido presided over this matter.

[4] It is unclear from the record why Parents were evicted. However, during direct examination, Father testified that their pipes were "being cut by the park management," and eventually the township came to their home because it did not have running water and posted a notice of eviction. N.T., 7/20/2022, at 155-156.

January 8, 2020, the court found that Parents had not made progress in addressing "financial instability or mental health concerns, the root cause of the housing instability." *Id.*

Initially, CYS referred Parents to Central Pennsylvania Family Support Services ("Family Support") for U-Haul services and a local cleanup crew for their home. N.T., 7/20/2022, at 91. After losing their home, in October and November 2019, Mother utilized Family Support to obtain funding for a replacement social security card, Father obtained funding for a state identification card, and Parents obtained funding for birth certificate duplicates. N.T., 7/20/2022, at 91-92, CYS Exhibit 13; Family Service Plan. However, on November 12, 2019, Family Support discharged Parents from their program because Father became very agitated and verbally aggressive towards a Family Support employee, claimed that no one had helped them, and demanded transportation to see Children. *Id.*

After Parents were evicted, in October 2019, they applied for housing at the Section 8 Department for Cumberland County Housing Authority (the "Housing Authority"). *Id.* at 80. Initially, Parents did not provide all necessary documents, but eventually provided the documents to the Housing Authority in January 2020. *Id.* However, in April 2020, with agreement from Parents' attorneys, CYS caseworker, Milton Webber, informed the Housing Authority that Children would not be returning to Parents due to their lack of

progress with the Family Service Plan ("FSP"), so Parents were not provided a housing voucher and were placed on a wait list.  *Id.* at 82.

By July 2020, Parents had not made progress on the FSP, and CYS filed petitions to terminate Parents' parental rights to Children and for goal change. After an evidentiary hearing on July 15, 2020, the orphans' court denied these petitions and allowed parents more time to achieve reunification.

In November 2020, Parents began visitation together with Children through ABC.[5]  N.T., 7/20/2022, at 30.  Ultimately, ABC stopped providing visitation services in January 2022, after Father was "very abrasive" to the ABC visitation supervisor, Linda Mapes, and accused her of abusing Children. *Id.* at 32.  Ms. Mapes testified that she was merely attempting to redirect Children, and she was shocked by Father's accusations.  *Id.* at 32-33.  After this incident, Ms. Sweger, the director of ABC, testified that none of her visitation supervisors were willing to work with Father, so ABC terminated their services with Parents.  *Id.* at 40.

In July 2021, Parents received a housing voucher from the Housing Authority.  *Id.* at 81-82.  Parents were responsible for locating a home, but, even after two extensions, Parents were unable to find a suitable place, and the voucher expired in December 2021.  *Id.* at 80-81.  Parents reapplied for

_____

[5] From May 2019 to November 2020, due to Parents lack of transportation and the COVID-19 pandemic, they were unable to participate in visitation at ABC.  N.T., 7/20/2022, at 29, CYS Exhibit 13; Family Service Plan.

a housing voucher in January 2022, and the Housing Authority sent letters in February and March 2022 requesting missing information. *Id.* at 84, 179. Thereafter, the Housing Authority did not receive all the missing information from Parents until June 2022, one month before the termination hearing. *Id.* at 180. At the time of the hearing, Parents had not obtained a new voucher and had not found suitable housing. *Id.* at 83-85.

On June 22, 2022, CYS filed petitions to change Children's permanency goals from reunification to adoption, and six days later, CYS filed petitions for the involuntary termination of Parents' parental rights pursuant to 23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b). The orphans' court conducted an evidentiary hearing on July 20, 2022, at which time Children were ages nine, seven, six, and five, respectively. The court appointed a guardian *ad litem* ("GAL") and separate legal counsel for Children.

During the hearing, CYS presented the testimony of the following individuals: (1) Felishia Houck, mental health outpatient therapist for P.S. and T.S.; (2) Lia Gormsen, behavior consultant for P.S.; (3) Katelyn Fisher, behavior consultant for J.S.; (4) Ms. Mapes, visitation supervisor at ABC; (5) Ms. Sweger, owner and director of ABC; (6) Becky Shull, director of the Section 8 department for Cumberland County Housing; (7) Mr. Webber, caseworker for CYS who, as best we can discern from the record, worked with the family from May 2019, until December 2021; (8) Karl Packer, caseworker

for CYS who worked with family from January 2022, until the termination hearing; and (9) M.S., paternal grandmother and Children's caregiver.

Mother was represented by Attorney Hahn and testified on her own behalf. She also presented the testimony of Stephen and Maureen Roth, husband and wife, who supervised visitation after ABC discharged Parents; and Richard Robison, Mother's therapist.[6] Father was represented by Attorney Coover and testified on his own behalf. Father also presented testimony of Lisa Smyser, an applications assistant with the Housing Authority.

By decrees dated August 2, 2022, and entered August 3, 2022, the orphans' court involuntarily terminated Parents' parental rights to Children pursuant to 23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b). In addition, by orders entered August 4, 2022, the court changed Children's permanency goals to adoption. Parents' individually filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[7] The court filed a Rule 1925(a) opinion on October 21, 2022.

_____

[6] Mr. and Mrs. Roth are acquaintances of Parents and are not affiliated with any agency. CYS approved them as supervisors for Parents' visits with Children. N.T., 7/20/2022, at 48.

[7] On September 1, 2022, Parents, acting *pro se*, individually filed notices of appeal and concise statements of errors complained of on appeal. This Court dismissed as duplicative Mother's *pro se* appeals docketed at 1234-1237 MDA 2022 and Father's *pro se* appeals docketed at 1230-1233 MDA 2022. **See**
*(Footnote Continued Next Page)*

Attorneys Hahn and Coover filed petitions to withdraw and **Anders**
briefs in this Court on November 23, 2022, and November 29, 2022,
respectively, which we address first.

This Court has explained:

> When counsel files an **Anders** brief, this Court may not review the
> merits without first addressing counsel's request to withdraw.
> [T]his Court [has] extended the **Anders** principles to appeals
> involving the termination of parental rights. . . .

**In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014) (citations omitted).

> To withdraw pursuant to **Anders**, counsel must:
>
> 1) petition the court for leave to withdraw stating that, after
> making a conscientious examination of the record, counsel has
> determined that the appeal would be frivolous; 2) furnish a copy
> of the [**Anders**] brief to the [appellant]; and 3) advise the
> [appellant] that he or she has the right to retain private counsel
> or raise additional arguments that the [appellant] deems worthy
> of the court's attention.

**Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en
banc*) (citation omitted).

In **Santiago**, our Supreme Court held:

> [I]n the **Anders** brief that accompanies court-appointed counsel's
> petition to withdraw, counsel must: (1) provide a summary of the
> procedural history and facts, with citations to the record; (2) refer
> to anything in the record that counsel believes arguably supports
> the appeal; (3) set forth counsel's conclusion that the appeal is
> frivolous; and (4) state counsel's reasons for concluding that the
> appeal is frivolous.  Counsel should articulate the relevant facts of

---

**Commonwealth v. Ellis**, 626 A.2d 1137, 1139 (Pa. 1993) (emphasizing that
hybrid representation is forbidden on appeal).

record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.3d at 361. Additionally, this Court has stated that,

[P]ursuant to *Commonwealth v. Millisock*, 873 A.2d 748 (Pa. Super. 2005) and its progeny, "[c]ounsel also must provide a copy of the *Anders* brief to his client[, along with] a letter that advises the client of his right to: (1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the *Anders* brief."

*In re X.J.*, 105 A.3d at 4 (citation omitted).

With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d at 752. Finally,

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous."

*In re X.J.*, 105 A.3d at 4 (citation omitted).

Initially, we consider Attorney Hahn's petition to withdraw as Mother's counsel in her appeals. Attorney Hahn filed a petition to withdraw certifying his conscientious review and determination that Mother's appeals is frivolous. Counsel also filed an *Anders* brief which includes a summary of the procedural history and facts of the case with citations to the record, issues that could arguably support Mother's appeals, and counsel's assessment regarding why

the appeals are frivolous with citations to relevant legal authority. Finally, Attorney Hahn attached to his petition the letter that he sent to Mother advising of her right to 1) retain new counsel to pursue the appeal; 2) proceed *pro se* on appeal; or 3) raise any points that Mother deems worthy of this Court's attention. Accordingly, Attorney Hahn complied with the requirements of ***Anders*** and ***Santiago***.

With respect to Attorney Coover's petition to withdraw as counsel for Father in his appeals, she certified that Father's appeals contain no non-frivolous issues. Additionally, Attorney Coover filed an ***Anders*** brief which includes a summary of the procedural history and facts of the case; however, counsel does not provide citations to the record, instead citing the averments in the termination petitions. Attorney Coover's brief also (1) states that Father's appeals are wholly frivolous; (2) includes issues that could arguably support Father's appeal; and (3) provides the bare minimum necessary under ***Santiago*** regarding counsel's assessment for why Father's appeals from the termination decrees are frivolous, together with citations to relevant legal authority. Finally, Attorney Coover attached to her petition the letter she sent to Father advising of his right to 1) retain new counsel to pursue the appeal; 2) proceed *pro se* on appeal; or 3) raise any points that Father

deems worthy of this Court's attention.[8]   Ultimately, **Anders** and **Santiago** require "substantial[], if not perfect[]," compliance.   **Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa. Super. 2007).   After careful review, we conclude Attorney Coover's brief is substantially compliant with **Anders** and **Santiago**.

We next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

We note the standard of review in termination of parental rights cases:

> [A]ppellate courts . . . accept the findings of fact and credibility determinations of the trial court if they are supported by the record.   If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or

---

[8] Of note, counsel did not include a letter advising Father of his rights when she initially filed her petition to withdraw and **Anders** brief on November 29, 2022.  On December 2, 2022, this Court entered an order directing counsel to file a proof of service on Father and a **Millisock** letter.  Counsel failed to comply with this Court's December 2, 2022 order, and on December 15, 2022, this Court entered a second order directing counsel to comply with the December 2, 2022 order.  Counsel filed a response on December 21, 2022, which included an acceptance of service and a **Millisock** letter; however, counsel's letter was inadequate.  On December 22, 2022, this Court entered a third order directing counsel to file a letter in compliance with **Commonwealth v. Muzzy**, 141 A.3d 509 (Pa. Super. 2016).  Finally, on December 28, 2022, counsel filed a response with a copy of a letter that advised Father of his rights pursuant to **Millisock** and a certificate of service indicating Father was served with a copy of the letter.

We admonish counsel for the various shortcomings regarding her **Millisock** letter and **Anders** brief.  Eventually, counsel's filings provided the bare minimum required; however, counsel must be more careful in the future.

abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re J.N.M.*, 177 A.3d 937, 941-942 (Pa. Super. 2018) (citation omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights and requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re J.N.M.,* 177 A.3d at 942 (citation omitted). In order to affirm a termination of parental rights, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In the matter at bar, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b). Here, we analyze the court's termination decrees pursuant to Section 2511(a)(8) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. ***In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa. Super. 2018).

Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. ***In re M.A.B.***, 166 A.3d 434, 446 (Pa. Super.

2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the Section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

We observe that Sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children. However, the needs and welfare analysis required by Section 2511(a)(8) is distinct from the needs and welfare analysis required by Section 2511(b) and must be addressed separately. *In re C.L.G*., 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

This Court has recognized "that the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates

- 20 -

only a short period of time, to *wit* [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*.

Regarding Section 2511(b), we consider whether termination of parental rights will best serve a child's developmental, physical and emotional needs and welfare. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

"When conducting a bonding analysis, the court is not required to use expert testimony. [Instead, s]ocial workers and caseworkers can offer evaluations as well." *In re Z.P.*, 994 A.2d at 1121. Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). "'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121.

- 21 -

In the instant case, the orphans' court determined that Children were removed from Parents' home in May 2019 because the home was "inadequate" and "unsafe," there were mental health concerns for Parents, and Parents were uncooperative with CYS's efforts to provide aid. Orphans' Court Opinion, 10/21/2022, at 8. The court emphasized that, at each permanency review hearing, it impressed upon Parents the importance of obtaining appropriate housing. *Id.* at 9. The court stated that from September 2019, through the termination hearing in July 2022, Parents were without adequate housing. *Id.* The court also stated that Parents "were again becoming confrontational and obstreperous in their dealings with [CYS] and service providers." *Id.*

A careful review of the record supports termination pursuant to Section 2511(a)(8). At the time of the hearing, Children had been in placement for more than three years, far in excess of the statutory minimum. Concerning the second factor of Section 2511(a)(8), Parents never progressed beyond supervised visitation. N.T., 7/20/2022, at 51. Furthermore, Parents completed a FAST assessment in June 2020. *Id.* at 36. The assessment revealed that Parents would benefit from parenting education and Parents were recommended to SKILLS parenting program, which is an intensive in-home parenting service. *Id.* at 37. However, because Parents never obtained a suitable home in the three years Children were placed, Parents were not able to complete the program. *Id.*

Additionally, the evidence supports that Parents were again becoming uncooperative with CYS and other service providers. In January 2022, ABC terminated visitation services for Parents because at their visit on January 28, 2022, Father was "very abrasive" with Ms. Mapes, ABC visitation supervisor, and accused her of abusing Children. *Id.* at 32. On direct examination, she testified:

> Q: You said this was the last visit. What happened to cause this to be the last visit?
>
> A: After [Children] left and I came back in the building, [Father] was very abrasive with me and accused me of -- actually accused me of abusing [Children] while they were in the visitation because I had asked that they clean up toys before they got other toys out. I had asked [P.S.] not to get a soda in a cup when we were in the middle of dismissal.
>
> Q: So, would you characterize these things that you identified as redirection-type actions by you?
>
> A: Yes.
>
> Q: You said he accused you of abuse?
>
> A: Yes, abusing [Children].
>
> Q: How did you respond, if you recall?
>
> A: I tried very hard not to say too terribly much, because that was, quite frankly, shocking to me.
>
> Q: Was it conversational tone when he --
>
> A: No, sir.
>
> Q: How would you describe it?
>
> A: He was abrasive and yelling.

*Id.* at 32-33.  As related *supra*, Ms. Sweger, director of ABC, testified that none of her visitation supervisors were willing to work with Father so ABC discharged Parents.  *Id.* at 40.

Additionally, CYS caseworker, Mr. Packer, testified that since he began working with Parents in January 2022, they have not been cooperative.  *Id.* at 116.  Through their attorneys, in April or May 2022, Mr. Packer requested various materials from Parents: (1) address verification; (2) residency verification, if applicable, or updates regarding their search for housing through the Housing Authority; (3) income verification; and (4) verification of suitable transportation.  *Id.* at 111.  Mr. Packer testified that he does not know where Parents live on a daily basis.  *Id* at 112.  Additionally, CYS does not consider Parents income as stable.  *Id.* at 112.  Parents have only provided screenshots of their bank accounts, and for the first time, during the week of the termination hearing, Father provided a letter from his alleged employer, a seal coating business.  *Id.* at 112-115.  Relatedly, Mr. Packer testified that, regarding transportation, he is only aware of a van that does not contain appropriate seating to transport Children.  *Id.* at 115.  Mr. Packer also stated that he has not received any mental health records regarding Father.  *Id.* at 116.

Of note, Mr. Packer testified that Mother regularly visits with Children and participates in mental health counseling.  *Id.* at 118-119.  However, on

examination by the orphans' court, Mr. Packer testified that she follows the lead of Father due to Parents' codependency.  He explained:

> Q: I'm going to follow up on that.  Does [Mother] follow the lead of [Father] in your dealings?
>
> A: Correct.
>
> Q: And [Father] has been uncooperative?
>
> A: Correct.

N.T., 7/20/2022, at 119.  On cross-examination by Mother's counsel, Mr. Packer testified that, in his opinion, Mother follows Father's lead because of her "codependency." *Id.* at 119-120.  Additionally, on cross-examination by Mother's counsel, paternal grandmother also stated that Parents are codependent:

> Q: I understand the relationship that you're struggling to have with your son.  Can you separate your relationship with your son from your relationship with [Mother]; and if you're able to, how would you describe it?
>
> A: I struggle.  First of all, the two of them are a unit, very, very codependent.
>
> . . .
>
> Q: When you spoke of concern for mental health, you were speaking of [Father's] mental health, is that right?
>
> A: Definitely his, but I don't have an experience personally interacting with [Mother] without having [Father] with her.  So, I am not going to speak to how my perception of her mental health status is because I can't get a feel for it.

*Id.* at 131, 133.

Regarding housing, CYS caseworker, Mr. Webber, testified that CYS became involved with the family again in May 2019 because of inappropriate housing. N.T., 7/20/2022, at 91. Mr. Webber indicated that CYS referred Family Support which offered U-Haul services and a local cleanup crew to address the issues in the home, but Parents did not participate in that service. *Id.*

As related *supra*, Parents applied for housing at the Housing Authority in October 2019. *Id.* at 80. However, Parents did not provide all necessary documents, and the Housing Authority did not receive the missing documents until January 2020. *Id.* Additionally, in April 2020, because Parents had been uncooperative and were not meeting their FSP goals, with agreement from Parents' attorneys, CYS caseworker, Mr. Webber, informed the Housing Authority that Children would not be returned to Parents, so Parents did not obtain a housing voucher and were placed on a waiting list. *Id.* at 82.

Throughout his time on the case, Mr. Webber communicated with Parents' attorneys regarding what was needed to obtain housing, and directly spoke with the Housing Authority numerous times for updates. *Id.* at 101. Mr. Webber indicated that he received emails from Parents about searches, but never received "any letters from any landlords saying that [Parents] confirmed any appointments with them or that [Parents] looked at a place." *Id.* On inquiry by the orphans' court, Mr. Webber testified as follows,

> Q: Well, the big thing here is housing. Did they ever establish housing while you were the caseworker?

A: No, your Honor, they did not.

*Id.* at 101.

CYS caseworker, Karl Packer, who succeeded Mr. Webber as the family caseworker at the beginning of 2022, confirmed, as follows, on direct examination that Parents still do not have appropriate housing:

Q: Other than [Father's attorney's] address at her office, did you receive any type of address verification from [Parents]?

A: No.

Q: As far as – you are not aware of them obtaining a residence at this point?

A: No. We have pieced together that they obtained a storage unit, but no housing.

Q: So, at this point, do you know where they live on a day-to-day basis?

A: No.

Q: Is that something you've been requesting from counsel?

A: Yes.

*Id.* at 112. Parents reapplied for a housing voucher in January 2022, but the applications lacked complete information. *Id.* at 84, 179. Accordingly, the Housing Authority sent letters to Parents in February and March 2022 requesting the missing information. *Id.* Thereafter, the Housing Authority did not receive all the necessary documents from Parents until June 2022, just one month prior to the termination hearing. *Id.* at 180.

Additionally, Ms. Shull, director of the Housing Authority, testified that, typically only twenty percent of vouchers expire before housing is located, and during the eviction moratorium,[9] she estimated that "maybe [thirty] percent expired," but people were still locating housing. *Id.* at 83, 86. At the time of the termination hearing, Parents had not obtained a new voucher, and Ms. Shull stated that a new voucher could be obtained in two weeks to two months depending on Parents' cooperation. *Id.* at 85.

Father testified that Parents have consistently been looking for housing but have not been successful due to extenuating circumstances; (1) Parents lack of credit; (2) their need to obtain birth certificates so the Housing Authority could provide a voucher; and (3) rental application fees. *Id.* at 142-143, 145-146. Father also stated that he believed that once they had the voucher that Parents would have housing possibly "in a week or two." *Id.* at 172. Despite this contention, as related *supra*, Parents did not provide CYS or the orphans' court with proof that a suitable home was imminent. Accordingly, the conditions that led to Children's removal had not been remedied. Thus, Parents' reunification with Children was not imminent at the time of the termination hearing. *In re I.J.*, 972 A.2d at 11.

---

[9] During the COVID-19 pandemic, state and federal eviction moratoriums prohibited eviction, ejection, or other displacement for failure to make payments.

Regarding the third factor of Section 2511(a)(8), the orphans' court heard sufficient testimony that termination of Parents' parental rights would best serve the needs and welfare of Children. Children have lived with paternal grandparents since May 2019. *Id.* at 90-91, 121. Paternal grandmother testified that since Children moved in, they have been doing great and have made progress. *Id.* at 122. Ms. Houck, trauma therapist for P.S. and T.S., confirmed that they "made a lot of progress" since they started therapy with her two years ago. *Id.* at 17. Similarly, Ms. Fisher, behavioral consultant for J.S., testified that he has made significant progress since he started in March 2021. *Id.* at 24. Ms. Fisher testified she meets with J.S. once a week, and that initially he would have a tantrum for the entire session. *Id.* at 24, 26. However, currently, J.S. only has a tantrum "maybe once a month," and "he's able to request a break" if needed. *Id.* at 27.

Additionally, prior to the start of the termination hearing, the court interviewed P.S. and T.S., and T.S. stated, "[paternal grandmother is] safe. She takes care of us. And she loves us, and we love her. But, also, [Mother] and [Father] are not as safe, because when we were at the trailer park, they fought a lot." *Id.* at 5.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding that Parents' conduct warrants termination pursuant to Section 2511(a)(8). The record demonstrates that Children have been removed from Parents' care far in excess of the 12-month statutory

minimum; the conditions that led to removal have not been remedied and reunification was not imminent at the time of the hearing; and termination would best serve the needs and welfare of Children.

The court also did not abuse its discretion in determining that termination best serves Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). As related *supra*, Children have lived with paternal grandparents for over three years, since May 2019. N.T., 7/20/2022, at 121. Furthermore, prior to the start of the termination hearing, the court interviewed P.S. and T.S., who stated that they would like to live with paternal grandparents. *Id.* at 5. T.S. also stated, and P.S. confirmed, that R.S. and J.S. "want to live with [paternal grandmother], too" for "the same reasons as us." *Id.*

Ms. Houck, therapist for P.S. and T.S., confirmed that both girls want to stay with paternal grandparents. *Id.* at 20. Similarly, Ms. Fisher, behavior consultant for J.S., stated that J.S. has expressed his desire to live "at grammie's" because "he's scared of the fighting and yelling." *Id.* at 25. Finally, paternal grandmother testified that, "[Children] know we love them. They know we provide for them." *Id.* at 124. Although Parents love Children, and the court acknowledged a bond, "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121.

Additionally, during inquiry by the court, paternal grandmother confirmed that she is confident that any adverse effects the Children may suffer due to termination will be overcome by the strong bond Children share with her and her husband. She explained:

> Q: If I were to terminate parental rights, do you foresee any adverse consequences to [Children]?
>
> A: I think that's a loaded question in that [Children] will respond -- I do know [Children] have told multiple therapists, multiple caseworkers, that they want to live with us. Will it cause trauma? I think any undertaking will cause -- they're going to have to work through it.
>
> Q: Do you think that their bond with you and your husband will enable them to work through it with you help?
>
> A: I do believe so. I do believe that there's feelings of wanting to stay with us. I don't push one way or the other. They know we love them. They know we provide for them. We know we're there emotionally for them. That will continue. They are all in therapies, as you're well aware, and I'm not going to sever those should we gain permanent care of them. As long as they need those services, mental health and otherwise, I'm going to continue them.

*Id.* at 124. Paternal grandmother also stated that she would allow Parents contact with Children, even if their parental rights were terminated, if it were "a safe environment for [Children]", and Children indicate that they want to see Parents. *Id.* at 125-126. Accordingly, the orphans' court did not abuse its discretion in determining that termination best serves Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Our independent review of the certified record reveals no preserved non-frivolous issue that would arguably support these appeals from the decrees.

Finally, we decline to review Parents' appeal from the orders changing Children's permanency goals in light of our disposition on the appeals from the termination decrees. By affirming the termination decrees, Parents' appeals from the goal change orders are moot. ***See In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

Therefore, we grant Attorneys Hahn's and Coover's petitions to withdraw from representation, affirm the decrees terminating Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b), and dismiss as moot the appeals from the orders changing Children's permanency goals to adoption.

Attorneys Hahn's and Coover's petitions to withdraw granted. Decrees affirmed. Appeals from goal change orders dismissed as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/13/2023